Jonathan Shub (SBN 233705)
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, PA 19102
Telephone: (215) 564-2300
Facsimile: (215) 851-8029

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: TOYOTA MOTOR CORP. HYBRID BRAKE MARKETING, SALES PRACTICES and PRODUCTS LIABILITY LITIGATION**<br><br>**This Document relates to:**<br><br>8: 10-CV-00154-CJC-RNB<br>2: 10-CV-00173-CJC-RNB<br>2: 10-CV-01154-CJC-RNB<br>8: 10-CV-01248-CJC-RNB<br>8: 10-CV-01255-CJC-RNB | **Docket No. MDL-2172**<br><br>**Assigned to Hon. Cormac J. Carney**<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE THE TESTIMONY AND REPORT OF PLAINTIFF'S EXPERT DR. MICHAEL A. WILLIAMS**<br><br>**Date: Sept. 24, 2012**<br>**Time 2:00 PM**<br>**Ctrm: 9B**<br><br>**Filed concurrently with Declarations of Jonathan Shub and Justine S. Hastings** |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................1

II.  BACKGROUND AND RELEVANT FACTS ...................................2

III. DR. WILLIAMS' OPINIONS AND REPORTS............................5

    A. Dr. Williams' Education, Training and Experience ....................5

    B. Dr. Williams' Opinions ...............................................................5

    C. Dr. Williams' Methodology ........................................................6

        1. Common Impact .................................................................6

        2. Classwide Damages ..........................................................6

IV.  LEGAL STANDARD FOR EXPERT TESTIMONY.....................7

V.   ARGUMENT ..................................................................................10

    A.   Dr. Williams Has Relied on Accurate Facts and Data for His
        Opinions ...............................................................................10

    B.   Dr. Williams Applied Proper Methodology to the Facts of this Case.....13

    C.   Dr. Williams Established that His Opinions Rest on Reliable Methods
        Applied to this Case .............................................................16

        1. Two-Step Damages Methodology Based on (1) the Increased
           Expected Cost of Accidents and (2) Hedonic Regression is a
           Proper Method for Assessing Damages in this Case.....17

        2. Dr. Williams Properly Utilized Contingent Valuation and Discrete
           Choice Experiments.........................................................20

    D.   Dr. Williams Opinion Will Assist the Trier of Fact
        on Damages and Injury .......................................................23

VI.  CONCLUSION ..............................................................................25

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*In re Aftermarket Automotive Lighting Products Antitrust Litigation*,
   276 F.R.D. 364 (C.D. Cal. 2011) ........................................................................14

*Behrend v. Comcast Corporation*,
   264 F.R.D. 150 (E.D. Pa. 2010) ...................................................................14, 19

*Behrend v. Comcast Corporation*,
   655 F.3d 182 (3d Cir. 2011) ........................................................................15, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) .................7, 8, 9, 17, 21

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
   *No.* M 02-1486, 2006 WL 1530166 (N.D. Cal June 5, 2006) .......................14, 23

*Ellis v. Costco Wholesale Corporation*,
   657 F.3d 970 (9th Cir. 2011) ......................................................................14, 15

*Fresenius Medical Care Holdings v. Baxter International, Inc.*,
   *Nos.* C 03-1431, 2006 WL 1330000 (N.D. Cal May 15, 2006) ...........................9

*Hangarter v. Provident Life & and Accident Insurance Company*,
   373 F.3d 998 (9th Cir. 2004) .............................................................................8

*In re Hydrogen Peroxide Antitrust Litigation*,
   552 F.3d 305 (3d Cir. 2009) ............................................................................15

*Keegan v. American Honda Motor Co.*,
   No. cv.10-09508, 2012 WL 2250040 (C.D. Cal. June 12, 2012) ........................9

*Kennedy v. Collagen Corporation*,
   161 F.3d 1226 (9th Cir. 1998) ........................................................................8, 9

*Meijer v. Abbott Laboratories*,
   No. C 07-5985, 2008 WL 4065839 (N.D. Cal. Aug. 27, 2008)..........................15

*Negrete v. Allianz Life Insurance Company of North America*,
   238 F.R.D. 482 (C.D. Cal. 2006) .....................................................................25

ii

*In re Online DVD Rental Antitrust Litigation*,
   No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ..............9, 15

*In re Paoli RailRoad Yard PCB Litigation*,
   35 F.3d 717 (3d Cir. 1994)...................................................... 7-8, 10

*Perez v. State Farm Mutual Auto Insurance Co.*,
   No. C 06-01962 JW, 2011 WL 8601203 (N.D. Cal. Dec. 7, 2011)...............15, 17

*Schulz v. QualxServ, LLC*,
   09-CV-17-AJB MDD, 2012 WL 1439066 (S.D. Cal. Apr. 6, 2012)....................14

*Sementilli v. Trinidad Corporation*,
   155 F.3d 1130 (9th Cir.1998)...................................................................7

*Somers v. Apple, Inc.*,
   258 F.R.D. 354 (N.D. Cal. 2009) ........................................................... 15

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   267 F.R.D. 583 (N.D. Cal. 2010) ........................................................... 14

*Weisfeld v. Sun Chemical Corporation*,
   84 F. App'x 257 (3d Cir. 2004) .......................................................16, 21

*Wolin v. Jaguar Land Rover North America, LLC*,
   617 F.3d 1168 (9th Cir. 2010).................................................................12

**FEDERAL RULES**

Fed. R. Evid. 104(a) ..............................................................................7

Fed. R. Evid. 702 .........................................................................7, 8, 23

Plaintiffs submit this memorandum of law in opposition to Defendants' Motion to Exclude the Opinion and Report of Dr. Michael A. Williams. Plaintiffs also submit the Declaration of Justine S. Hastings, dated August 28, 2012, in support of their opposition.

## I.      INTRODUCTION

Plaintiffs have tendered the expert report of Dr. Michael A. Williams in this matter to opine on class-wide damages issues. Dr. Williams is a highly qualified economist who holds a Ph.D. in economics from the University of Chicago and has testified in multiple federal court proceedings. Dr. Williams analyzed data produced in this case, along with publicly available materials, and utilized well-established economic methods to show that "each buyer who purchased or leased a Prius or Lexus vehicle before February 8, 2010 was harmed because the flow of services over time provided by the vehicle (*i.e.*, safety) was less than they expected when they purchased or leased the vehicle, and this harm is common to all members of the proposed class." *See* Decl. of Jonathan Shub, dated August 28, 2012, Ex. A, Dr. Michael A. Williams Expert Report, April 27, 2012, ¶ 15.[1]

Dr. Williams' opinions that Toyota's actions inflicted a common harm among the proposed class, and that there are reliable economic methods to determine this harm, are helpful to the trier of fact because they directly address the commonality and predominance requirements of class certification. This qualifies him under applicable expert standards.

Even though Defendants are unable to dispute the fact that Dr. Williams is a well-qualified expert, who used reliable means to provide relevant information,

---

[1] Dr. Williams also submitted a Reply Report in this matter, dated June 19, 2012. A copy of this reply report is attached as Ex. B. He was deposed on June 22, 2012. A copy of the applicable transcript excerpts are attached as Ex. C.

Defendants have moved to disqualify him from testifying.  Their motion is simply a jumble of objections that misstate and misapply the applicable legal standards and assume that disputed factual issues have already been decided in their favor.  Thus, Defendants' motion should be denied in its entirety.

## II.   BACKGROUND AND RELEVANT FACTS

Over 70 years ago, Toyota was founded with one mission in mind – to provide "[its] customers with the *safest, most reliable* vehicles in the world."  ¶ 27.[2] Since then, it is indisputable that Defendants have touted the *"safety," "reliability," and "quality"* of their vehicles to consumers, and specifically, those that are the subject of this action: the Model Year 2010 Toyota Prius ("Prius") and the Model Year 2010 Lexus HS 250h ("Lexus") (collectively, the "Defective Vehicles").  ¶¶ 1, 3, 28-29.  Toyota's aggressive marketing of its "Star Safety System," as early as January 2009, as a standard feature on all of its cars, including the Defective Vehicles, typifies Defendants' emphasis on safety as a major selling point.[3]  *See*, *e.g.*, ¶¶ 30-35.

Unbeknownst to Plaintiffs and Class members, the brake system in the Defective Vehicles is subject to a dangerous design and/or manufacturing defect that causes intermittent loss of braking power during the application of the brakes on rough or slick road surfaces (the "Defect").  ¶ 3.  Recall Explanation documents Toyota provided to dealerships describe the Defect as resulting in "instantaneous

---

[2] All "¶" references in the Case Background Section are to Plaintiffs' First Consolidated Amended Class Action Complaint ("FAC"), filed on April 26, 2011 [D.E. #89].  A copy of the FAC is attached as Ex. D.  Further, at all times, emphasis is added unless otherwise indicated.

[3] The Star Safety System is comprised of five component systems: Anti-Lock Braking System (ABS); Brake Assist; Electronic Brake-Force Distribution; Traction Control; and Vehicle Stability Control.  ¶ 30.  Each depends on normal braking functionality.  *Id.*

degradation in braking force," Ex. E at 11026, and a "gap between expected brake force and actual brake force," Ex. F at 11033.  Toyota explained to its dealers and customers that, "***this may lead to an increase of vehicle stopping distance and thus raise the possibility of a crash***" and advised its customers to "***please allow additional distance between your vehicle and the vehicle in front of you so as to provide additional stopping distance***."[4] ¶ 62; Ex. G at 9271; Ex. H at 11017, 11022.  The National Highway Transportation Safety Administration ("NHTSA") noted in an internal memorandum that the Defect ***"could be fatal for pedestrians."*** ¶ 65.   This Defect rendered the Defective Vehicles unsafe from the outset by increasing the likelihood of an accident when the brake system did not function properly.  *Id.*

Toyota received hundreds of consumer complaints from drivers of the Defective Vehicles, through its network of Toyota and Lexus dealerships, NHTSA, and third-party companies, such as Nielsen Company, which provide Toyota marketing and advertising research.[5]  ¶¶ 5-6, 10, 52-54, 57.  Discovery has revealed that these complaints, which provided specific descriptions of the defect, were received as early as July 2009, long before the February 8, 2010 Recall (defined below).   For example, a January 12, 2010 Market Impact Summary ("MIS") concerning the Prius summarizes multiple consumer complaints, including a July 17, 2009 Technical Assistance Call ("TAS Case") in which a customer complained

---

[4] Further, Toyota informed its dealers, that, "[a]s required by Federal law, dealers are not to deliver any new vehicles in their inventory, which are involved in a Safety Recall unless the defect has been remedied."

[5] Toyota acknowledged in its Defect Information Report filed with NHTSA that it learned of the Defect at least as early as August 2009.  *See* Ex. I at 14.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

that the vehicle felt like it accelerated while braking and hitting a bump.[6]  Ex. J at 485.  Despite their knowledge of the Defect (which they were able to duplicate and diagnose), Defendants failed to timely disclose to consumers the Defective vehicles' dangerous condition.  ¶¶ 6-7, 10, 56.

Instead, Toyota introduced a secret "software update" as a "running production change" for the Prius in January 2010, which was purportedly designed to correct the Defect by "improving the ABS system's response time, as well as the system's overall sensitivity to tire slippage."  ¶¶ 8-9, 58.  In fact, Toyota was working on the software update as early as December 17, 2009.  Ex. K at 46341-42.

As a result of the numerous complaints Toyota received concerning the Defect, NHTSA announced on February 3, 2010 that it had opened a formal investigation into the matter.  ¶ 55.  NHTSA also noted that it received reports that four crashes resulted from the Defect.  *Id.*  On February 8, 2010, almost *7 months* after Defendants first became aware of the safety issues associated with the Defective Vehicles, Toyota finally admitted the existence of the Defect and announced separate recalls in the United States, Japan and Europe.  ¶¶ 11, 59-61.  The recall in the United States affected approximately 133,000 Prius vehicles manufactured prior to the "running production change" and 14,500 Lexus vehicles (the "Recall").  ¶¶ 11, 60.

In late February 2010, owners and lessees of the Defective Vehicles were informed that they were entitled to bring their vehicles to Toyota dealers to receive the "software update," among other services, at no charge.  ¶ 11.  Despite the software update, it appears that certain Defective Vehicle owners, including Plaintiff Jessica Kramer, still experience the Defect.  ¶¶ 3, 13, 19, 68-73.  Toyota began receiving complaints concerning the persistence of the Defect and

---

[6] A February 3, 2010 MIS concerning the Lexus likewise shows multiple reports made directly to Toyota long before the announcement of the Recall.  Ex. L.

investigating the issue almost immediately following installation of the first software updates.  Ex. K at 46310, 46312, 46315-16, 46318, 46323, 46326, 46332, 46335.  These facts cast doubt on the effectiveness of the software update on a class-wide basis.  *See also* ¶¶ 3, 13, 19, 68-73.

## III.   DR. WILLIAMS' OPINIONS AND REPORTS

### A.   Dr. Williams' Education, Training and Experience

Dr. Williams is a Director at Competition Economics, LLC, and specializes in analyses involving antitrust, industrial organization, and regulations.  *See* Ex. A ¶ 1.  He earned a B.A. in economics from the University of California, Santa Barbara, and an M.A. and Ph.D. in economics from the University of Chicago.  Dr. Williams has published articles in a host of peer-reviewed academic journals.  *Id.* ¶¶ 1-3.  He has provided testimony before a number of federal district courts, as well as public utilities commissions in several states, *see id.* ¶ 2.

### B.   Dr. Williams' Opinions

Dr. Williams analyzed whether there exist economic methodologies and evidence common to all proposed class members that could be used to assess the alleged impact of Toyota's actions.  He then analyzed whether there exist damages methodologies and evidence common to all proposed class members that could be used to assess classwide damages, assuming the impact of Toyota's actions is common to all class members.  Ex. B ¶ 2.

With respect to common impact, Dr. Williams concluded that from the date of purchase up to February 8, 2010 (*i.e.*, the date Toyota publicly announced the existence of the brake defect), each buyer who purchased or leased a Prius or Lexus vehicle with the braking defect was harmed because the defect "may lead to an increase of vehicle stopping distance and thus raise the likelihood of a crash."[7]  He

---

[7] *See* Ex. M.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

further found that harm is common because the brake defect "may lead to an increase of vehicle stopping distance and thus raise the likelihood of a crash"[8] for each member of the proposed class.  *Id.* ¶ 7.  In analyzing class-wide damages, Dr. Williams concluded that there exist damages methodologies and evidence common to all proposed class members that could be used to assess class-wide damages.

### C.   Dr. Williams' Methodology

#### 1.   Common Impact

The economic methodology used by Dr. Williams to assess common impact is fundamental economic theory: people attempt to maximize their expected utility. Since individuals value safety, automobile crashes lower people's utility, and people prefer fewer automobile crashes to more automobile crashes.  Or stated in the alternative, no member of the proposed class prefers more automobile crashes to fewer automobile crashes.

Dr. Williams showed that the economic evidence used to assess the liability claims for each proposed class member is also common to all class members.  All members of the proposed class purchased a Prius or Lexus vehicle before February 8, 2010.  In particular, all members of the proposed class purchased a Prius or Lexus vehicle before Toyota's "running production change" in January 2010, and these vehicles had a brake defect.  He concluded, therefore, that the claims of all proposed class members arise from the same facts that give rise to plaintiffs' liability claims.

#### 2.   Class-wide Damages

Dr. Williams presented two alternative damages methodologies and cited numerous academic articles that have applied these methodologies to examine similar issues.  The first is a two-step damages methodology.  The first step uses

---

[8] Ex. M.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

well-established highway safety methodologies to measure the expected cost to a buyer of the increased probability of being in an accident as a result of the Defect. This step covers damages from the date of purchase up to February 8, 2010. The second step measures the loss (if any) in the value of a used Prius or Lexus vehicle that occurred on or after February 8, 2010. The economic methodology utilizes hedonic price regression.

Dr. Williams also presented an alternative damages methodology, based on estimating how much lower the vehicle prices would have been if Toyota had publicly revealed the brake defect prior to buyers purchasing their vehicles. Dr. Williams showed that there are two independent economic methodologies, based on survey data – contingent valuation and discrete choice experiments – that can estimate how much lower the vehicle prices would have been if Toyota had publicly revealed the Defect prior to purchase. Again, he cited numerous published papers that rely on these methodologies to quantify consumer harm.

## IV.    LEGAL STANDARD FOR EXPERT TESTIMONY

"In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1134 (9th Cir.1998) (internal quotation marks omitted). Rule 702 is applied consistent with the "'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786, 2789, 125 L. Ed. 2d 469 (1993). Rule 702 of the Federal Rules of Evidence, the Supreme Court's decision in *Daubert*, and the caselaw applying *Daubert* govern the admission of expert evidence. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or

to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Court determined that a district court serves a "gatekeeping" function for expert testimony, as provided by Federal Rules of Evidence Rule 104(a).  The district court must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *see also Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1228 (9th Cir. 1998) (same, quoting *Daubert*).  As *Daubert* instructs, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

For Rule 702, the first consideration is that "a witness proffered to testify to specialized knowledge must be an expert.  Rule 702 "contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal citation omitted).  This is the "qualifications" requirement of Rule 702.

The second requirement of Rule 702 is that the expert must testify to "scientific, technical, or other specialized knowledge that will assist the trier of fact."  This means that "the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his belief." *In re Paoli Railroad PCB Litig.*,

8

35 F.3d 717, 742 (3d Cir. 1994) (internal quotations and citation omitted).  This is the "reliability" portion of the rule.

Finally, Rule 702 requires that the expert's testimony must assist the trier of fact.  The expert's testimony must be scientific knowledge for the purpose of the particular case in which it is offered.  *See id.* at 743.  This is the "fit" requirement.  *Daubert,* 509 U.S. at 579.  To satisfy this requirement, the expert testimony must assist the trier of fact in understanding or determining a fact in issue.  *Id.* at 591.

"Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."  *Kennedy v. Collagen Corp*., 161 F.3d 1226, 1231 (9th Cir. 1998) (internal citation omitted).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Fresenius Med. Care Holdings v. Baxter Int'l, Inc*., Nos. C 03-1431, 2006 WL 1330000, at *3 (N.D. Cal May 15, 2006) (citations omitted).

"On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant to determining 'whether there was a common practice that could affect the class as a whole.'"  *Keegan v. Am. Honda Motor Co.*, No. cv. 10-09508, 2012 WL 2250040, at *5 (C.D. Cal. June 12, 2012) (quoting *Ellis v. Costco*, 657 F.3d 970, 983 (9th Cir. 2011)).  "The issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a classwide measure of [impact] through generalized proof."  *In re Online DVD Rental Antitrust Litig*., No. M 09-2029, 2010 WL 5396064, at *10 (N.D. Cal. Dec. 23, 2010) (internal citation and quotations omitted).

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

# V.  ARGUMENT

## A.    Dr. Williams Has Relied on Accurate Facts and Data for His Opinions

As an initial matter, Defendants do not contend that Dr. Williams lacks the knowledge, skills, and experience to provide economic opinions in this case.  Dr. Williams relied on a host of materials, all relevant and critical to this action, in formulating his opinions.  Ex. A ¶ 5.  He also used statements from Toyota and government documents in preparing his report: "my statements about the defect come primarily from … Toyota's documents, supplemented, if you will, with certain additional ones from either NHTSA or the office of defective investigation, ODI...."  Ex. C at 145-46, 148:8-13.

Defendants contend that Dr. Williams' opinions are not the product of accurate facts or data.  This argument is fatally flawed because Defendants assume that heavily disputed facts in this litigation have already been resolved, in their favor.  For example, Defendants assert that "Dr. Williams assumed that Toyota's software update did not remedy the ABS issue for all customers," then state that "this assumption also lacks any evidentiary foundation."  *Id.*  A few sentences later, however, Defendants contradict this assertion, acknowledging that Plaintiff Jessica Kramer testified that her vehicle still suffered from the defect.

Plaintiffs already adduced significant common proof of the existence of the Defect and Toyota's knowledge of it.  For example, Defendants acknowledged internally that "driver's expectation" is not an individualized expectation but a general one.  *See* Ex. N (illustrating that the Defect results in a change in brake performance that creates a gap between the driver's expectation of braking force and actual braking force delivered).  Defendants also acknowledged publicly that the Defect increases the likelihood of a crash.  *See* Ex. G (notice to dealerships that the defect "may lead to an increase of vehicle stopping distance and thus raise the

possibility of a crash" and the attached sample notice to Toyota customers stating the same). And Defendants continued to receive reports that the Defect remedy has been ineffective. *See* Ex. O (document prepared by the Nielsen Company reporting numerous consumer complaints that drivers continue to experience the defect despite having received the defect remedy).

Further, Toyota wrote to Prius owners and stated: "until the *remedy is completed* on your vehicle Toyota advises drivers to depress the brake pedal using firm pressure. Also, *please allow additional distance between your vehicle and the vehicle in front of you so as to provide additional stopping distance*" (emphasis added). *See* Ex. M at 4. Similarly, Toyota informed its dealers: "As required by Federal law, dealers are not to deliver any new vehicles in their inventory, which are involved in a Safety Recall unless the *defect has been remedied* (emphasis added). *See id.*

Toyota states, at Def. Br. 7, n.2, that "Dr. Williams conceded the possibility that 'the defect just did not increase the likelihood of a crash.'" This quote is taken out of context. Dr. Williams responded to a hypothetical question in which he was asked to assume that "[i]f accident data indicates that there is no realized difference in crash experience between a defect, a pre-recall Prius and a post-recall Prius, is that information significant to your opinion that harm exists on a class-wide basis as a result of the defect?" Ex. C at 139:1-6. However, Dr. Williams specifically disputed the factual basis for this assumption, saying "[t]hat's something that hypothetically could be correct. It's not my understanding of the facts, because my understanding of the facts are based on the Toyota documents that are inconsistent with that hypothesis." *Id*. at 139:1-140:24.

Toyota further argues that if its software fix correctly solved the defect, then customers would have a safe car, and that "Dr. Williams' failure to consider evidence that the recall worked destroys the reliability of his opinions." Def. Br. at

9.    This is incorrect.   First, in making this argument, Toyota implicitly acknowledges that there was a braking defect.  Second, even if the software update did remedy the defect sometime on or after February 8, 2010, this does not change the fact that from the date of purchase up to the date the software update allegedly remedied the brake defect, all proposed class members were harmed by driving a vehicle with a brake defect.  If proposed class members had enjoyed the "benefit of the bargain," they all would have paid less for their vehicles since their willingness to pay for a vehicle with a brake defect would be lower than their willingness to pay for a vehicle without a brake defect.

Defendants essentially argue that because Dr. Williams' report does not prove a defect, it should be inadmissible.  This is not the standard, however.  As the Ninth Circuit noted in *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010), "[W]e have held that proof of the manifestation of a defect is not a prerequisite to class certification."  *Id.* at 1173.  As is the case here, in *Wolin*, Defendants were really arguing whether Plaintiffs could prevail on the merits. But "[f]or appellants' claims regarding the existence of the defect and the defendant's alleged violation of consumer protection laws, this inquiry does not overlap with the predominance test."  *Id.*

Defendants question the soundness of Dr. Williams' assumption that "all things being equal, '[p]eople prefer fewer automobile crashes to more automobile crashes.'"  Def. Br. at 9.  Defendants fail to refute this common sense statement with convoluted commentary from their proposed expert Dr. Dorris.[9]

Toyota questions Dr. Williams' conclusion that "people prefer fewer automobile crashes to more automobile crashes," assuming all other things are

---

[9] Plaintiffs have filed a motion to exclude the opinions and testimony of Dr. Dorris [D.E. #'s 239-241].

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

equal.  Def. Br. at 9.  Toyota states: "but all other things are not equal in the real world," citing a tradeoff between vehicle speed limits and safety.  Toyota's argument is illogical because there is no such tradeoff in the present case.  Customers did not face a choice between (1) a vehicle with a brake defect and a higher speed limit and (2) a vehicle without a brake defect and a lower speed limit.[10]

Toyota claims that safety was not an important aspect of Toyota's marketing campaign.  This will no doubt come as a surprise to Toyota's customers and dealers.  And "[t]his fact is evident in Toyota's marketing campaign, *e.g.*, for its Star Safety System."  Ex. A ¶ 12.  But more importantly, whether safety was an important aspect of Toyota's marketing campaign is irrelevant to the damages incurred by proposed class members.  They all purchased vehicles that, unknown to them but known to Toyota, had a brake defect.  Had they known this fact before they purchased the vehicles, they would have only been willing to pay less for those vehicles and, as a direct result, the prices paid would have been less.

For these reasons, Defendants have failed to demonstrate that the assumptions and facts upon which Dr. Williams bases his opinions are unreliable or unsound.

**B.  Dr. Williams Applied Proper Methodology to the Facts of this Case**

Dr. Williams testified that "I'm offering the opinion that I believe that there are damage methodologies that are common to the members of the proposed class."

---

[10] As Dr. Williams noted in his Reply Report, in an economically appropriate damages analysis, "the relevant comparison is between (1) the observed prices in real world and (2) the prices in the but-for world in which Toyota publicly reveals the brake defect."  Ex. B. ¶ 38.  The but-for world is defined to isolate the effect of the alleged liability.  The but-for world should be the same as the real world, with the exception that facts or conduct that allegedly cause liability are removed.  *Id.*

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

Ex. C at 178:5-20.  Dr. Williams has applied his education, training and experience to the materials relevant to the case, and determined that several economic methods are suitable to show class wide damages.

Defendants argue that because Dr. Williams did not conduct a damages study at the class certification stage, he did not apply his methodology to the facts. However, Defendants are arguing for far more than Plaintiffs are required to provide at this stage of the litigation.  "A plaintiff need not establish by a preponderance of the evidence the merits of its claims at the class certification stage, and any inquiry into the merits that is not necessary to a Rule 23 decision is precluded." *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 155 (E.D. Pa. 2010), *aff'd*, 655 F.3d 182, *cert. granted in part*, 11-864, 2012 WL 113090 (U.S. June 25, 2012).[11]   Rather, Plaintiffs are only required to show a method to demonstrate impact on a classwide basis.  *See In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 368 n.2  (C.D. Cal. 2011) ("Plaintiffs must show that the claims of the class depend upon a common contention"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *10 (N.D. Cal June 5, 2006) (predominance requirement met where "plaintiffs have identified a valid methodology for determining impact on a class-wide basis."); *Perez v. State Farm Mut. Auto Ins. Co.*, No. C 06-01962, 2011 WL

---

[11]  *See also Behrend v. Comcast Corp.*, 655 F.3d 182, 190 (3d Cir. 2011) ("Accordingly, at the class certification stage, we are precluded from addressing any merits inquiry unnecessary to  making a Rule 23 determination."); *Ellis v. Costco*, 657 F.3d 970, 983 n.8 ("The district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims."); *Schulz v. QualxServ, LLC*, Nos. 09-cv-17, 09-cv-2081, 2012 WL 1439066, at *3 (S.D. Cal. Apr. 6, 2012) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 604 (N.D. Cal. 2010) ("Plaintiffs are not required to prove the merits of their case-in-chief at the class certification stage.") (internal citations omitted).

8601203, at *5 (N.D. Cal. Dec. 7, 2011) (Court rejects motion to exclude expert where expert "describes a method of using regression analysis to establish formulas for class-wide damages."); *Meijer v. Abbott Labs.*, No. C 07-5985, 2008 WL 4065839, at *10 (N.D. Cal. Aug. 27, 2008) ("Plaintiffs have proffered methods for calculating aggregate damages for overcharges.... The validity of those methods will be adjudicated at trial...."); *In re Online DVD Rental Antitrust Litig.*, No. M. 09-2029, 2010 WL 5396064, at *9 (N.D. Cal. Dec. 23, 2010) (Expert testimony accepted where plaintiffs "put forth a feasible methodology to show that the impact ... can be measured, in a manner and with regard to evidence that applies equally to all class members."). Dr. Williams has done this with both his reports and testimony.

In fact, Defendants' cited cases do not provide otherwise. The holding of *Somers v. Apple, Inc*., 258 F.R.D. 354 (N.D. Cal. 2009) is not that a completed damages study is required at the class certification stage, as Defendants' brief suggests. Rather, in *Somers*, the Court disallowed the proposed expert testimony because of a host of problems with his report – little data collection, lack of information about his proposed models to demonstrate they would work, failure to identify variables, and lack of equations – in addition to his not developing a model. 258 F.R.D. at 360. Further, in *Somers*, the expert's report was a scant five paragraphs long. *Id.* at 361. Ultimately, the Court concluded that plaintiffs did not meet their burden of "establishing a reliable method for proving common impact on all purchasers of defendant's products throughout the chain of distribution." *Id.* at 361. Here, Dr. Williams has shown that there are several methods for proving common impact.

In *In re: Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 311-12 (3d Cir. 2009), the Court stated: "Plaintiff's burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits

---

15

each class member must do so."  Rather, "the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."  *Id*.  The Third Circuit reversed the district court because the district judge did not weigh the defendant's expert's opinion against that of the Plaintiff's; *i.e*., the district court used an improper standard.  Even there, though, the Third Circuit stated that "the question at class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." *Id.* at 325.

In *Weisfeld v. Sun Chemical Corp*., 84 Fed. Appx. 257 (3d Cir. 2004),[12] the District Court rejected plaintiffs' expert because it was "not convinced" that Weisfeld's expert "will be able to prove impact on a classwide basis."  The problem, then, was not that the expert had not attempted to prove impact, but that the Court did not believe he would be able to do so.  Here, Dr. Williams has sufficiently shown he will be able to evaluate damages on a classwide basis.  The *Weisfeld* court was further concerned that the proposed expert had submitted only a three page declaration which contained only "naked conclusions that common proof would demonstrate injury to class members." *Id*. at 261.  Again, that is not the case here, as Dr. Williams has provided two detailed reports analyzing data that explain how the economic methods are applicable.

### C. Dr. Williams Established that his Opinions Rest on Reliable Methods Applied to this Case

Defendants argue that Dr. Williams failed to show that his proposed methods for evaluating class-wide injury and damages are reliable.  This is merely a

---

[12] The *Weisfeld* Court noted that multiple regression analysis, the method used by Dr. Williams here, has "been widely accepted" in the Third Circuit.  *Weisfeld*, 84 Fed. Appx. at 261-262.

recitation of the legal standard for reliability, as is the statement that "where an expert's testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" Defendants ignore that Dr. Williams may rely on materials normally used by experts in their field, and that his report and testimony describe how his opinions are shaped by multiple articles, books, his past expert testimony, and basic economic principles.  Moreover, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Perez v. State Farm Mut. Auto. Ins. Co*., No. C 06-01962, 2011 WL 8601203, at *7 (N.D. Cal. Dec. 7, 2011) (quoting *Daubert*, 590 U.S. at 592).

> **1.  Two-Step Damages Methodology Based on (1) the Increased Expected Cost of Accidents and (2) Hedonic Regression is a Proper Method for Assessing Damages in this Case**
>
> **a.  Increase in the Expected Cost of an Accident (Damages from the Date of Purchase up to February 8, 2010)**

Dr. Williams demonstrated that highway safety experts, including the NHTSA, have well-established methodologies for estimating the expected cost of an accident.  Ex. B ¶¶ 12-15.  He showed that using these well-established methodologies, a direct method to estimate damages resulting from the harm caused by the brake defect in the Prius and Lexus vehicles is to calculate the change (due to the brake defect) in the proposed class members' expected cost of a crash. According to Toyota, the braking defect "may lead to an increase of vehicle stopping distance and thus raise the likelihood of a crash."[13]  Thus, the brake defect increases the probability of a crash and, consequently, increases the expected cost of a crash.  Dr. Williams further showed that the increase in the expected cost of a

---

[13] *See* Ex. M.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

1   crash equals the product of the average cost of a crash and the increase (due to the

2   brake defect) in the probability of a crash.

3        Dr. Williams' reply report described, in detail, how highway safety experts

4   have well-established methodologies for estimating the cost of an accident.[14]  Ex. B

5   ¶ 12.  "A direct method to estimate damages resulting from the harm caused by the

6   brake defect in the Prius and Lexus vehicles is to calculate the change (due to the

7   brake defect) in the proposed class members' expected cost of a crash."  *Id.*  He

8   then laid out the methodology and the equations required, and described the data

9   sources – the Federal Highway Administration, the National Highway Safety

10  Administration, and the National Automotive Sampling System.  *Id.* ¶ 13-15; *see*

11  *also* Hastings Decl. ¶ 20 (Dr. Williams "does establish the general reliability of this

12  method by appealing to fundamental mathematics and statistics, and by citing

13  databases and methodologies used by the government itself to calculate the cost of

14  accidents.").

15       Defendants contend that "Dr. Williams could not credibly explain why the

16  increased likelihood of an accident is an appropriate damages measure if it would

17  compensate consumers for the mere possibility of an accident."  Def. Br. at 21.  But

18  Dr. Williams, in fact, explained that because each car had the defect, each Plaintiff

19  did actually suffer from the increased likelihood of a crash.  Ex. C at 212:14-213:6.

20       With respect to the increased expected cost of accidents approach, Toyota

21  quotes from Dr. Williams' deposition, but again omits a key part of his answer, in

22  an attempt to mislead this Court regarding his statements.  Def. Br. at 5.  He stated

23  that "I do have a very strong opinion that it can be implemented

24  methodologically—that the data exist to [do] it."  Ex. C at 184:3-5.

---

25  [14] Dr. Williams does not "tacitly acknowldeg[e]" flaws in his initial report when

26  discussing this method; his reply report was written largely to counter incorrect

27  conclusions made by Defendants' proposed expert, Dr. Toppel.  Ex. B ¶ 4.

28

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE

### b.  Using Hedonic Price Regression to Measures Reductions in Prius  and Lexus Used Car Prices (damages on or after Feb. 8, 2010)

Dr. Williams concluded that "standard hedonic price regressions utilizing market prices on new and/or used Prius and Lexus vehicles can be used to measure the loss in value that customers incurred following Toyota's February 8, 2010 announcement of the defect."  Ex. A ¶ 7.  Hedonic price theory "specifies that the determinants of a product's price are represented by the various attributes of the product.  That is, a hedonic model of prices is one that decomposes the price of a product into separate components that determine the price."  *Id*. ¶ 21.  "[T]he methodology has also been specifically employed to measure the effect of safety-related recalls on consumer valuations of automobiles."  *Id*. ¶ 24.

Dr. Williams testified that the hedonic regression methodology was "first introduced to [him] in grad school more than 30 years ago now.... It's a pretty commonly used technique in economics."  Ex. C at 33:20-25.  He further testified that he utilized this technique with *Exxon* and in the *I-Phone* Litigation.  *Id*. at 33:1-21.  Further, he relied on hedonic regression in the *Behrend* case.  *Id*. at 44:14-16.[15] Hedonic regression was used in two peer-reviewed journal articles that are now 25 years old.[16]  *Id*. at 218:3-15.  This methodology has thus been tested, subjected to peer review, and is generally accepted.

---

[15] *Behrend v. Comcast Corp*., 264 F.R.D. 150 (E.D. Pa. 2010), *aff'd*, 655 F.3d 182, *cert. granted in part*, 11-864, 2012 WL 113090 (U.S. June 25, 2012).

[16] Defendants argue that these articles "do not establish that hedonic regression analysis could be used to measure 'benefit of the bargain' damages in this case."  Def. Br. at 16.  Dr. Williams contests this, noting that papers cited in his report "present empirical findings showing that, in fact, brake-related product recalls diminished the resale value of cars with such brake defects."  Ex. B ¶ 21.  But even if that were true, Dr. Williams has explained in detail, as noted above in his

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

Defendants note that their proposed expert, Dr. Topel, concluded that there was no evidence of a reduction in the market prices of used Prius and Lexus vehicles, and that this conclusion rendered Plaintiffs' reliance on this methodology improper. *See* Def. Br. at 15. But as Dr. Williams noted, "Dr. Topel's price charts provide a simple view of the data. However, they do not hold constant economic factors that may affect the relationships between the vehicle prices he charts." Ex. B ¶ 21. This necessitates "using the hedonic price regression methodology and economic data common to the class," as detailed in Dr. William's initial report. *Id.*

Defendants wrongly contend that Dr. Williams "did not and could not identify how he would actually perform the hedonic regression." Def. Br. at 16. This is simply incorrect. In his Report, Dr. Williams: (1) described the hedonic regression methodology; (2) provided an example of a specific regression specification that could be used to measure class-wide damages; and (3) showed that data are available with which to estimate the hedonic pricing regression. Ex. A. ¶¶ 20-30. In his Reply Report, Ex. B ¶¶ 16-24, Dr. Williams further discussed how the hedonic pricing methodology could be used in the present case to estimate class-wide damages. He also rebutted Dr. Topel's incorrect assertions regarding the use of hedonic pricing regressions in the present case. *See also* Hastings Decl. ¶ 13 ("[H]edonic regressions have been used extensively in the literature to estimate measures of "willingness-to-pay" for product characteristics.").

### 2. Dr. Williams Properly Utilized Contingent Valuation and Discrete Choice Experiments

Dr. Williams testified that surveys could be used to determine class-wide damages, and described two economic methods to utilize in the surveys: Contingent Valuation ("CV") and Discrete Choice Experiments ("DCE"). Dr. Williams testimony, that this is a commonly-used economic technique that he has used in past expert testimony.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

showed that, in the present matter, basic economic theory shows that consumers' willingness to pay would have been lower in a but-for world in which they knew about the brake defect before purchasing the vehicles.   The CV and DCE methodologies are independent of one another, and both can be used to measure the lower but-for prices of the Prius and Lexus vehicles in a but-for world in which Toyota publicly reveals the brake defect before buyers purchase the vehicles. Damages calculated using the CV and DCE methodologies would not be added together since these methodologies would measure the same type of damages. Similarly, damages calculated using the CV and DCE methodologies would not be added to any damages calculated using the two-step methodology discussed in Section III.

*Contingent Valuation*.  Dr. Williams also testified that Contingent Valuation could be utilized to measure classwide damages.  He stated that "I tried to give several specific examples out of those thousand of peer reviewed studies of methodologies that are specific implementations of the general contingent valuation methodology that in my opinion would rely on economic evidence common to the class and a methodology common to the class that could ... be used to estimate class-wide damages."  Ex. C at 244:16-25.  As Dr. Williams notes, a recent book by a contingent valuation scholar cited more than 7,500 CV studies, most of which have been published in peer-reviewed journals.  Ex. B ¶ 27; *see also* Hastings Decl. ¶ 16 (Dr. Williams "referenced key books summarizing the peer reviewed research using CV to measure willingness to pay or valuation for product or product attributes.").

Defendants contend that contingent valuation is not "generally accepted," in part because their proposed expert had not seen an article on this method in the journal he edited.  *See* Def. Br. at 18.  But, Dr. Williams cited many articles on this method that had been peer reviewed.  *See* Ex. C ¶ 14; *see also* Hastings Decl. ¶ 17

21

("CV, and stated preference approaches in general, are generally accepted approaches to estimating the value of goods and their characteristics in environment and transportation economics."). Furthermore, "general acceptance" is not required by *Daubert*.

**Discrete Choice.** The DCE methodology "is a standard econometric approach that measures WTP by using attribute based surveys to elicit consumer preferences." *Id*. ¶ 31. The DCE methodology is "widely used in travel behavior research and practice to identify behavioral responses to choice situations which are not revealed in the market...." *Id*.

For Discrete Choice, Dr. Williams stated "[T]he methodology ... of discrete choice experiments is well established in thousands of peer reviewed papers, and the specific implementation of that general methodology in the context of analyzing the willingness to pay for reductions in automobile risks also appears in a number of peer reviewed papers." Ex. C at 271:21-272:12.

Dr. Williams also discussed how the study would be implemented: "For example, using a controlled survey, consumers could be presented with hypothetical scenarios in which they were asked to specify their willingness to pay for vehicles with and without a brake defect." Ex. A ¶ 32. Additionally, consumers also could be presented with hypothetical scenarios in which they were asked to specify their willingness to pay for vehicles with and without a break defect, but where the break defect would be corrected in a specified period of time ... after their purchase." *Id*. Then, the data would be analyzed using standard regression methods. *Id*.

Toyota claims that DCE is not a reliable methodology. *See* Def. Br. at 19. Again, Toyota's only support for this claim consists of statements from Dr. Topel. In contrast, Dr. Williams' Reply Report, *see* Ex. B ¶¶ 31-34, showed that the DCE methodology is generally accepted and has specifically been used in peer-reviewed

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE**

research to measure individuals' willingness to pay for reductions in the risk of automobile accidents.

### D. Dr. Williams Opinion Will Assist the Trier of Fact on Damages and Injury

Under Rule 702, an expert may give testimony if "the expert's 'scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'"  Dr. Williams concludes that "each buyer who purchased or leased a Prius or Lexus vehicle before February 8, 2010 was harmed because the flow of services over time provided by the vehicle (*i.e.*, safety) was less than they expected when they purchased or leased the vehicle, and this harm is common to all members of the proposed class."  In class actions, "[g]enerally speaking, the test for predominance is met when there exists generalized evidence which proves or disproves an [issue or element] on a simultaneous, class-wide basis."  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006). This class-wide evidence on injury and damages is exactly what Dr. Williams has provided in his reports and testimony.

Defendants' contention that Dr. Williams' reasoning is "circular" on the subject of impact or injury makes no sense in the context of this case.  The proposed class purchased or leased cars with a defect common to all the cars.  Dr. Williams makes the rather logical conclusion that the same problem in each car will have a class-wide impact.

Toyota claims that "Dr. Williams' suggestion that every single customer would have valued a vehicle without the ABS issue *at exactly the same amount—* regardless of age, gender, income, driving history, or subjective perception of the ABS issue—is not only unhelpful, it is nonsensical" (emphasis added).  Def. Br. at 24.  Not surprisingly, Toyota fails to cite any statement by Dr. Williams supporting

23

their claim.  In fact, Dr. Williams never made this "suggestion."  He clearly stated his position that all members of the proposed class have a common—not identical—impact.  Ex. B ¶ 7.

Toyota further states that "Plaintiffs allege—and Dr. Williams agrees—that they would have paid less for their cars had they known of the ABS issue.  There is no evidence to support the assertion."  Def. Br. at 24.  Toyota is incorrect. As Dr. Williams explained: "The economic methodology in the above analysis is fundamental economic theory: people attempt to maximize their expected utility. Since automobile crashes lower people's utility, people prefer fewer automobile crashes to more automobile crashes.  Ex. B ¶¶ 7-10.  Moreover, Dr. Williams provided a number of examples of peer-reviewed articles that show that automobile buyers value safety.

In support of its claim that customers might have paid the same prices for the vehicles had they known of the ABS issue, Toyota cites the report of Dr. Keller. His report contains no economic data or economic theory—just his speculation that "many customers would have paid the same amount for the subject vehicles regardless of TMS's representations regarding safety and reliability."  Def. Br. at 24.

Dr. Keller is wrong.  As Dr. Williams explained, if customers had known of the braking defect before they purchased the subject vehicles, their willingness to pay would have been lower.  This follows because: "People prefer fewer automobile crashes to more automobile crashes . . . and fundamental economic theory: people attempt to maximize their expected utility."  As a result, the demand curve for the subject vehicles would have shifted to the left, resulting in lower prices. *See* Ex. C ¶¶ 35-37.

Defendants argue that Dr. Williams' testimony is not helpful on damages because the question of "how much less" a purchaser or lessee would have paid for

24

the car, knowing of the defect, "cannot be answered on a classwide basis."  Def. Br.
at 24.  But again, they have misstated the standard required of Plaintiffs here.  Dr.
Williams' testimony is being offered for class certification purposes, and the
caselaw shows that "[p]articularly where damages can be computed according to
some formula, statistical analysis, or other easy or essentially mechanical methods,
the fact that damages must be calculated on an individual basis is no impediment to
class certification."  *See Negrete v. Allianz Life Insurance Co. of North America*,
238 F.R.D. 482, 494 (C.D. Cal. 2006).

## VI.    CONCLUSION

For the foregoing reasons, the motion to exclude the reports and testimony of
Dr. Williams should be denied in its entirety.


Dated:  August 28, 2012                        SEEGER WEISS LLP


                                               By: /s/Jonathan Shub_____
                                               Jonathan Shub (SBN 233705)
                                               Chris M. Van de Kieft
                                               SEEGER WEISS LLP
                                               1515 Market Street, Suite 1380
                                               Philadelphia, PA 19102
                                               Telephone: (215) 564-2300
                                               Facsimile: (215) 851-8029

                                               Jamie Mogil, Esq. (*Pro Hac Vice*)
                                               FARUQI & FARUQI, LLP
                                               369 Lexington Avenue, 10th Fl.
                                               New York, NY 10017
                                               Telephone:  (212) 983-9330
                                               Fax:  (212) 983-9331
                                               -and-
                                               David Bower
                                               10866 Wilshire Blvd., Suite 1470
                                               Los Angeles, CA 90024

25

Phone: (424) 256-2884
Facsimile: (424) 256-2885

Marc L. Godino
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Karin E. Fisch (*Pro Hac Vice*)
Jeremy Nash (*Pro Hac Vice*)
ABBEY SPANIER RODD
& ABRAMS, LLP
212 E. 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Co-Lead Counsel for Plaintiffs*

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO EXCLUDE