**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE TOYOTA MOTOR CORP. HYBRID BRAKE MARKETING, SALES PRACTICES and PRODUCTS LIABILITY LITIGATION | Case No.: CV 10-00946-CJC(RNBx)<br>MDL No.: SAML 10-02172-CJC(RNBx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

## I. INTRODUCTION

Plaintiff David Gelber brings this putative class action against Defendants Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc. (together, "Toyota") on behalf of himself and others similarly situated, who purchased or leased a model year 2004–2009 Toyota Prius ("Gen II Prius") vehicle in California. Mr. Gelber alleges that Gen II Prius vehicles have a defective anti-lock braking system ("ABS") resulting in unsafe extended stopping distances. Specifically, he alleges that because of a programming defect, the ABS activates and decreases brake pressure when the vehicle encounters a bump, crack,

or other rough road surface, even though ABS is generally not necessary on such surfaces. He further alleges that the vehicles fail to rapidly rebuild brake pressure if the ABS is erroneously activated. Mr. Gelber asserts four causes of action: (1) violation of the California Consumer Legal Remedies Act ("CLRA"); (2) violations of California Business and Professions Code § 17200, *et. seq*. ("UCL"); (3) unjust enrichment; and (4) breach of implied warranty under California's Song-Beverly Consumer Warranty Act. Before the Court is Mr. Gelber's motion for class certification. Because Mr. Gelber has not shown that common questions of law and fact predominate over questions affecting only individual members, the Court **DENIES** his motion for class certification.

**II. BACKGROUND**

On February 8, 2010, Lisa Creighton and Miriam Ramirez filed a nationwide class action against Toyota, alleging that several Toyota vehicles, including Gen II Prius vehicles, suffer from a defective braking system. Ms. Creighton and Ms. Ramirez, along with five additional plaintiffs, filed a First Amended Complaint ("FAC") on September 27, 2010. (Dkt. No. 75.) The FAC alleges that Gen II Prius vehicles are equipped with a brake system that includes three components: a regenerative braking component, a hydraulic braking component, and a vehicle stability control system containing the ABS. (FAC ¶ 4.) These three components are controlled by a device called the Skid Control Electronic Control Unit ("ECU"). (*Id*.) The ECU is allegedly programmed to incorrectly read and interpret changes in wheel speed and improperly engage ABS in circumstances where ABS is not required. (*Id*. ¶ 5.) Specifically, when the ABS activates, it allegedly causes the primary braking function to switch from regenerative braking to hydraulic braking. (*Id*. ¶ 6.) "The time delay that results when the ECU changes from Regenerative Braking to Hydraulic Braking to ABS and back to Hydraulic Braking when

there is, in fact, no need for Anti-Lock Braking, dangerously extends the distance required to stop" the vehicle.[1] (*Id.*)

Over the course of litigation, all seven plaintiffs named in the FAC were voluntarily dismissed from this action. (Dkt. Nos. 157, 271, 278, 326, 343.) Mr. Gelber was substituted as a named plaintiff on September 10, 2012. (Dkt. No. 271.) Mr. Gelber purchased his Gen II Prius vehicle on September 25, 2006. (Dkt. No. 404 [Defs.' Amended Compendium of Evidence ("Defs.' ACE")], Exh. 18 ["Gelber Dep."] 69:21–24.) He has driven the vehicle more than 40,000 miles, and continues to drive it on a regular basis, often with other passengers. (*See* Defs.' ACE, Exh. 23; Gelber Dep. 18:16–18; 154:17–155:6; 158:1–10.) He has never attempted to sell his vehicle. (Gelber Dep. 122:21–23.) He has also never been in an accident, hit any object, or failed to stop his vehicle as a result of the alleged ABS defect. (Gelber Dep. 125:21–126:14; 127:4–23; 128:8–14.) Over the course of the seven years during which he has driven the vehicle, he only recalls one "close call" caused by the alleged defect. The close call occurred when he was driving at night and a taxi cab "darted" in front of him. (Gelber Dep. 128:15–24.) Mr. Gelber's vehicle went over a bump as he pressed on the brakes, and the ABS activated. (Gelber Dep. 128:25–129:3.) He was not able to stop the vehicle as quickly as he had anticipated, and had to swerve in order to avoid an accident. (Gelber Dep. 130:1–9.)

**A. ABS**

Under certain driving conditions, such as on wet or icy road surfaces, braking too hard may cause the wheels to "lock up," causing a vehicle to skid. (Defs.' ACE, Exh. 3 ["Martens Report"] at 21; Dkt. No. 347 [Paradis Decl. in Supp. of Pl.'s Mot. for Class

---

[1] Mr. Gelber appears to have abandoned the specific claim that switching between the braking systems causes a delay resulting in extended stopping distances.

Cert. ("Paradis Decl.")], Exh. 27 ["Limpert Report"] at 7.)  When this occurs, the driver loses the ability to steer or otherwise control the vehicle.  (Martens Report at 21; Limpert Report at 7.)  ABS is a safety feature that is designed to prevent wheel lockup, allowing the driver to maintain control of the vehicle.  (Defs.' ACE, Exh. 1 ["Walker Report"] at 5.)  It works by momentarily preventing a further increase in brake pressure or by decreasing brake pressure in situations where there is a risk of wheel lockup.  (Martens Report at 25.)  The ABS must activate and decrease brake pressure within approximately 13 milliseconds to prevent wheel lockup.  (Defs.' ACE, Exh. 15 ["Limpert Dep."] 39:12–20; *see* Walker Report at 6.)  Although ABS activation ensures that the driver maintains control of the vehicle, it often results in increased stopping distances.  (Martens Report at 21.)  Generally, however, maintaining control of the vehicle is more important than minimizing stopping distances.  (Limpert Dep. 41:12–18.)

Crucial to the usefulness of ABS is the vehicle's ability to determine when ABS is required.  To do this, ABS continuously monitors wheel speeds to determine if the wheels are "slipping," or slowing down too rapidly, which may lead to wheel lockup.  (Martens Report at 26.)  While "wheel slip" typically occurs on slick road surfaces, it also occurs when a vehicle encounters a bump, crack, or other rough road surface, referred to as a "step."  (Martens Report at 27.)  Unlike on slick road surfaces, there is usually not a risk of wheel lockup when the vehicle encounters a step.  However, at the initial moment the vehicle encounters a step, the wheel slip caused by the step is identical to the wheel slip caused by a slick surface.  (Martens Report at 26–29.)  In other words, the ABS cannot tell whether the vehicle has hit a pothole or whether it is on a patch of ice.  It is only after some time has passed (measured in milliseconds) that the ABS can differentiate between a step and a slick surface.  (Martens Report at 29.)

Because of this limitation in the ABS's ability to differentiate between a step and a slick surface, there is a tradeoff that must be made.  If the ABS activates and decreases

brake pressure at the first hint of wheel slip, it may activate in situations where it is not actually needed, such as when encountering a step. (Martens Report at 29.) On the other hand, if it is designed to activate only after conclusively determining that ABS is necessary, there will be a delay in reducing brake pressure in situations where it is actually required, such as on ice. (Martens Report at 29–30.) The Gen II Prius' ABS is designed to activate at the first hint of wheel slip. (Martens Report at 29.) As a result, it may activate and decrease brake pressure when encountering a step. The ABS, however, is designed to mitigate the effects of the brake pressure reduction in such situations. Once the ABS conclusively determines that the vehicle encountered a step and there is no other risk of wheel lockup, the ABS is designed to rapidly increase brake pressure. (Martens Report at 29.)

**B. Mr. Gelber's Experts**

In support of his motion for class certification, Mr. Gelber presented evidence from two experts, Nader Bagherzadeh, Ph.D., who examined the Gen II Prius' source code,[2] and Rudolf Limpert, Ph.D., who performed test runs to observe the actual performance of the ABS. Dr. Bagherzadeh compared the Gen II Prius' source code to Toyota's ABS specifications. The specifications are a blueprint used by Toyota engineers to program the source code. (Dkt. No. 344 ["Ito Decl."] ¶ 4; Martens Report at 15–17.) In his initial expert report, Dr. Bagherzadeh identified one particular section of the source code, referred to as "Condition A," that is not programmed in accordance with the specifications. (Paradis Decl., Exh. 3 ["Bagherzadeh Report"] at 13.) Condition A is a set of logic instructions that allows the vehicle's rear wheels to make a step determination independent of the front wheels.[3] (Bagherzadeh Report at 15.) Dr. Bagherzadeh

---

[2] The source code provides a set of programming instructions by which the vehicle operates.

[3] "Step determination" refers to the vehicle's ability to determine whether it has hit a bump, pothole, or other rough surface on the road.

-5-

additionally opined in his initial report that the Gen II Prius ABS is defective because it is programmed to activate and decrease pressure to the brakes before a full step determination has been made. (Bagherzadeh Report at 24–25.) In other words, the ABS is programmed to decrease brake pressure before it is able to conclusively determine whether the vehicle has encountered a step, as opposed to a slick surface.

Dr. Bagherzadeh further disclosed at his deposition that he had discovered another discrepancy between the specifications and the source code. (Defs.' ACE, Exh. 14 ["Bagherzadeh Dep."] 243:10–244:2.) This particular discrepancy was not the subject of any of his reports, and he apparently discovered it while reviewing materials in preparation for his deposition. (*Id.*) Dr. Bagherzadeh explained that the step determination portion of the source code is mistakenly programmed to measure front wheel pressure reduction where it should measure rear wheel pressure reduction. (*Id.*) This presumably affects the rear wheels' ability to make an independent step determination.

Mr. Gelber also presented evidence from Dr. Limpert, who performed a series of test runs of a single Gen II Prius vehicle to determine whether the vehicle's ABS activates when it encounters a step, and whether this results in extended stopping distances. Dr. Limpert conducted testing on both wet and dry surfaces, at three different speeds, using multiple types of steps.[4] (Limpert Report at 15–16.) He instructed the test driver to attempt to maintain a constant brake pedal force throughout the run. (Limpert Dep. 127:18–22.) He then compared the stopping distance of each test run to a hypothetical stopping distance had the ABS not activated. (Limpert Report at 22.) Dr. Limpert found that the vehicle exhibited extended stopping distances in 77 out of the 123 total runs, or 62.60% of the time. (Limpert Report at 17.) Although the actual stopping

---

[4] Specifically, he conducted testing using a two-inch step up, a two-inch step down, and a crack in the road surface.

-6-

distances varied considerably between test runs, he calculated an average of 3.23 feet of extended stopping distance at 20 kilometers per hour ("kph"), 14.53 feet at 50 kph, and 33.32 feet at 80 kph. (Limpert Report at 36.) Based on these results, Dr. Limpert concluded that "(i) there is a great level of hazardous consequence associated with the use of the brake system; and (ii) the hazardous condition has a high likelihood of occurring." (Limpert Report at 35.)

## III. ANALYSIS

Federal Rule of Civil Procedure 23(a) sets forth four requirements for maintenance of a class action. Under that rule, a class may only be certified if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If the threshold requirements of Rule 23(a) are met, then one of the three conditions of Rule 23(b) also must be established. *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Mr. Gelber seeks certification here under Rule 23(b)(3), contending that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Common questions predominate if the critical issues involved in the case are subject to generalized or common proof, as opposed to an individualized inquiry. *Sullivan v. Kelly Services, Inc.*, 268 F.R.D. 356, 364 (N.D. Cal. 2010) ("To determine whether the predominance requirement is satisfied, courts must identify the issues involved in the case and determine which are subject to generalized proof, and which must be the subject of individualized proof.") (internal quotations omitted); *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 501 (N.D. Cal. 2008) ("In order for common

questions of law or fact to predominate over individualized questions, the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.") (internal quotations omitted).  The efficiency, fairness, and superiority of a class action are lost if the material issues of law and fact must be resolved on an individual basis.  *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.").  The court may "probe behind the pleadings before coming to rest on the certification question, and . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites" for class certification are satisfied.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotations omitted).

Although there are serious questions as to whether Mr. Gelber can satisfy the commonality, typicality, and adequacy requirements of Rule 23(a), the Court need not address those questions because Mr. Gelber clearly cannot satisfy the predominance requirement of Rule 23(b)(3).  It is beyond dispute that the critical issue involved in this case is whether there is a manifest defect in the ABS that caused an actual injury to each member of the proposed class.  Unless Mr. Gelber and the class members can demonstrate that the ABS is actually defective, they cannot succeed on any of their claims.  The resolution of this crucial issue, however, cannot be accomplished through common or generalized proof as is required to maintain a class action.  It must be done through an individualized and particularized inquiry for each member of the proposed class.

Most problematic for Mr. Gelber is the fact that he has failed to show any defect in the ABS, let alone a defect that is common to the class. Mr. Gelber points to several potential defects in the source code, which presumably would affect all class members'

vehicles in the same way, but has failed to present any evidence linking these source code defects to the real-world performance of the ABS. In other words, he has failed to present any evidence that the defects in the source code actually cause dangerously extended stopping distances. All that remains, then, is Dr. Limpert's observation that a single Gen II Prius vehicle exhibited hypothetically extended stopping distances under a specific set of circumstances that are far from representative of real-world driving experiences. However, there is no evidence that these extended stopping distances are unsafe, let alone that they were caused by a defective ABS. Regardless, because there are a myriad of factors affecting ABS performance and stopping distances, to conclusively determine that each class member's vehicle exhibits the same extended stopping distances caused by the same underlying defect as the vehicle tested by Dr. Limpert would require fact specific inquiries into the unique circumstances of each class member's driving experience.

### A. No Common Defect

#### 1. ABS Improperly Activates Over a Step

The original defect theory presented in the FAC is that "the ECU engages the vehicles' Anti-Lock Brakes when it should not do so," specifically when it encounters a step. (FAC ¶ 73.) Although Mr. Gelber casually refers to this in his briefings, it is not one of his primary defect theories. It is undisputed that the ABS occasionally activates when a vehicle encounters a step. This is not a defect, however, as the ABS was designed to operate in this manner for safety reasons. (Martens Report at 29–30.) The ABS cannot immediately differentiate between a step and a slick road surface due to the fact that the initial wheel slip caused by a step is identical to the initial wheel slip caused by a slick surface. Although the decision to program the ABS to activate at the first hint of wheel slip means that the ABS may unnecessarily activate when the vehicle

encounters a steps, it also means that there will be no delay in activation when the ABS is truly needed. This is critically important given that the ABS must activate within approximately 13 milliseconds in order to prevent wheel lockup. (Limpert Dep. 39:12–20; *see* Walker Report at 6.) Not surprisingly, Mr. Gelber has failed to provide any examples of ABS systems that delay activation until after a step determination is made. (*See* Walker Report at 1, 6.) He has also failed to present any evidence that doing so would make the operation of the vehicle safer.

### 2. Source Code Differs from ABS Specifications

Mr. Gelber asserts that the ABS is defective because its source code is not programmed entirely in accordance with Toyota's ABS specifications. While it is undisputed that there are differences between the specifications and the source code, the fact that such differences exist does not, in and of itself, constitute a defect. The specifications are merely internal instructions providing a blueprint for the source code, and Toyota is not obligated to follow them. Indeed, one could imagine a situation in which the source code is programmed in a way that is *safer* than the specifications. What is truly important is whether the source code is programmed in such a way that the real-world performance of the ABS is defective, not whether the source code precisely maps the specifications.

#### a. Condition A

It is undisputed that Condition A, which was designed to allow the rear wheels to make a step determination independent of the front wheels, was improperly programmed into the source code. Mr. Gelber, however, has failed to provide any evidence that Condition A actually affects the real-world performance of the ABS. Although Dr. Bagherzadeh identified the Condition A defect in the source code, he did not evaluate

how it would affect actual ABS performance.  (*See* Bagherzadeh Dep. 269:5–270:1.)  Similarly, Mr. Gelber provides no explanation of how Condition A caused or contributed to the extended stopping distances Dr. Limpert observed in his empirical tests.  Indeed, it does not appear that Dr. Limpert conducted any analysis of the behavior of the rear wheels independent of the front wheels,[5] or examined in any way whether the rear wheels' inability to independently detect steps actually causes extended stopping distances.[6]  Condition A only constitutes an actionable defect if it actually affects the braking performance of Gen II Prius vehicles.  Mr. Gelber has failed to present any evidence of such a causal connection.

### b. Rear Wheel Pressure Reduction

Mr. Gelber asserts that the ABS is defective because "Toyota's engineers improperly coded the logic instructions that Toyota intended to measure the pressure reduction in the rear wheel brakes and that interrupt and cancel/reset the 'step determination' process for the rear wheels of the Prius Vehicles so that these logic instructions instead erroneously measure pressure reduction in the front wheel brakes of the Prius Vehicles."  (Dkt. No. 351 [Pl.'s Mem.] at 15.)  Unfortunately, the precise nature of this defect is unclear given that it does not appear in any of Mr. Gelber's experts' reports.  Indeed, the only mention in the record of this defect is a few passing statements by Dr. Bagherzadeh in his deposition testimony.  (*See* Bagherzadeh Dep. 243:10–244:2.)  Not surprisingly, then, Mr. Gelber has presented no evidence of how this defect affects

---

[5] At deposition, the best example Dr. Limpert could provide of Condition A manifesting was a run in which the rear wheel ABS activated and the front wheel ABS "may or may not have" activated. (Limpert Dep. 243:2–244:7.)

[6] In his reply brief, Mr. Gelber points to several graphs which he argues conclusively show the manifestation of Condition A in two test runs conducted by Dr. Limpert.  (Dkt. No. 397 ["Pl.'s Reply"] at 9–14.)  However, Mr. Gelber has failed to provide any evidence that the analysis contained in the charts was conducted by Dr. Limpert or another expert.  The Court therefore declines to give any weight to these arguments.  *See* Fed. R. Evid. 702.

the actual performance of the ABS or leads to extended stopping distances. It does not appear that Dr. Limpert was even aware of this defect when he conducted his test runs and drafted his reports. Needless to say, Dr. Limpert conducted no analysis of whether this specific defect has any connection to the extended stopping distances he observed.[7] Simply stated, there is no evidence that this specific defect affects the real-world performance of the ABS.

### 3. Brake Re-Pressurization

Mr. Gelber asserts that the ABS is defective because it does not adequately increase pressure to the brakes after detecting the existence of a step in the road surface. The ABS is designed to rapidly increase brake pressure in order to compensate for the initial brake pressure reduction when the vehicle encounters a step. Dr. Limpert, however, observed that often the brake pressure would be increased at a lower rate than specified in the source code, and in some instances would continue to decrease, after a step determination should have been made. (Paradis Decl., Exh. 22 ["Limpert Supp. Report"] at 18–68.)

Mr. Gelber, however, has failed to provide any evidence that Dr. Limpert's observations are due to an actual defect in the ABS. It would be counter-productive, and potentially dangerous, for the ABS to rapidly re-pressurize if there is still a risk of wheel lockup. The ABS must therefore consider numerous factors before deciding to increase brake pressure. Re-pressurization will vary depending on, among other factors, vehicle speed, wheel speeds, braking pressure, the length of time ABS has been activated,

---

[7] Mr. Gelber attempts to overcome these shortcomings by, after the fact, pointing to instances in Dr. Limpert's test runs where the defect supposedly manifested. (Pl.'s Reply at 14–17.) As with the Condition A defect, Mr. Gelber has failed to provide any evidence that the analysis linking this defect theory to the extended stopping distances was performed by an expert. The Court therefore declines to give any weight to these arguments. *See* Fed. R. Evid. 702.

whether ABS is activated for all wheels, and whether ABS has otherwise been terminated. (Defs.' ACE, Exh. 4 ["Martens Second Report"] App'x H.) Dr. Limpert, however, failed to account for these factors in his analysis, making it impossible to pinpoint the precise reason for the specific re-pressurization behavior he observed. In other words, based on the evidence presented by Mr. Gelber, it is impossible to determine whether the failure to re-pressurize was the result of a defective ABS, or whether it was simply evidence of a normally functioning ABS reacting to variable driving conditions.[8]

### 4. Extended Stopping Distances

Without any evidence of a specific defect in the source code or ABS design affecting the actual braking performance of Gen II Prius vehicles, Mr. Gelber is left with Dr. Limpert's expert opinion that the specific vehicle he tested exhibited unsafe extended stopping distances. Although Dr. Limpert did not identify in any of his reports what precisely constitutes an "unsafe" extended stopping distance, he testified at deposition that his expert opinion was based on a benchmark of six inches. (Limpert Dep. 186:6–9.) This benchmark, however, is arbitrary and unreliable. *See* Federal Rule of Evidence 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that under Rule 702, engineering expert testimony must be relevant *and* reliable). Dr. Limpert could not point to any documentation, publication, or government or industry standard mentioning a six-inch benchmark for unsafe extended stopping distances, (Limpert Dep. 188:9–189:3; 191:17–21). *See Kumho Tire*, 526 U.S. at 150 (to determine reliability, the court may consider whether a theory or technique can and has been tested, has been subject to peer review and publication, has standards controlling the technique's operation, and

---

[8] Even if Mr. Gelber had presented evidence that the failure to re-pressurize was the result of a defect, there is no evidence that the defect is common to the class. Dr. Bagherzadeh examined the ABS specifications and source code relevant to re-pressurization and determined that the pertinent sections are programmed correctly. (Paradis Decl., Exh. 4 ["Bagherzadeh Rebuttal Report"] at 8–12.) Indeed, on at least three test runs, Dr. Limpert observed re-pressurization in accordance with the level specified in the source code and specifications. (*See* Martens Supp. Report at 15.)

enjoys general acceptance within a relevant scientific community). Indeed, he could not provide any explanation at all as to how he developed the benchmark, and even admitted that the six-inch benchmark is arbitrary. (*See* Limpert Dep. 188:9–189:3; 191:17–21.)

Regardless, Dr. Limpert's test runs and analysis say very little about the actual safety of the real-world braking performance of Gen II Prius vehicles. As Dr. Limpert has acknowledged, "a product that is defectively designed . . . would have to be one where there is a great level of hazard consequence associated with the use *as measured by real-world experience* . . . ." (Limpert Dep. 260:14–261:5 (emphasis added).) The tests conducted by Dr. Limpert, however, are far from representative of real-world driving conditions. As common sense would indicate, and Toyota's experts confirmed, a driver who experiences a decrease in brake pressure caused by ABS activation would instinctively press harder on the brake pedal. Even Mr. Gelber admitted that when he wants to stop his vehicle faster, he presses harder on the brake pedal. (Gelber Dep. 89:16–19.) Dr. Limpert, however, directed his test driver to maintain constant brake pedal force throughout the test run. (Limpert Dep. 127:18–22.) It is no wonder, then, that he observed extended stopping distances after the ABS momentarily reduced brake pressure.

In contrast to Dr. Limpert, Toyota's experts designed their testing to mimic real-world driving conditions. Nathan T. Dorris, Ph.D., for example, instructed drivers to stop their vehicles at specific locations after encountering a step, to test whether drivers are able to compensate for any momentary brake pressure reduction caused by ABS activation. (Defs.' ACE, Exh. 5 ["Dorris Report"] at 18.) He observed that all of the drivers modulated their brake pedal force following ABS activation and were able to stop the vehicle where they intended to. (Dorris Report at 18–19.) Dr. Walker similarly observed that over the course of 400 braking events, "the level of break force modulation utilized by the drivers was sufficient to accommodate any variability in the . . . post-ABS

deceleration response." (Walker Report at 27.) Dr. Walker performed additional testing to see precisely how Dr. Limpert's extended stopping distances would be affected by increases in brake pedal force following ABS activation. (Walker Report at 13.) He found that a modest increase in brake pedal force, at a rate approximating the average increase in brake pedal force observed by Dr. Dorris, completely eliminated the extended stopping distances. (Walker Report at 13.) In fact, he found that the average stopping distance was more than 15 feet shorter than Dr. Limpert's average extended stopping distance and more than ten feet shorter than Dr. Limpert's hypothetical stopping distance without ABS activation. (Walker Report at 13.) Dr. Walker additionally tested the effect on stopping distances if the maximum brake pedal force is applied following ABS activation. (Walker Report at 13.) He found that the average stopping distance for such runs was more than 20 feet shorter than Dr. Limpert's hypothetical stopping distance without ABS activation. (Walker Report at 13.) In other words, Dr. Walker's tests show that in the real world, a driver who instinctively applies greater brake pedal force after ABS activation would never experience the sort of extended stopping distances observed by Dr. Limpert.[9]

---

[9] Mr. Gelber responds by arguing that brake pressure is independent of the driver's brake pedal force because the Gen II Prius' braking system "decides for itself what the relationship is between Driver's Force and Stopping Force, and ultimately deceleration – and it is the system itself that has the ability to continually change that relationship." (Limpert Supp. Report at 85.) Contrary to Mr. Gelber's assertion, however, this does not mean that the ABS would *never* increase braking pressure if a driver attempts to brake harder. While the "brake pedal is not used to *mechanically* transmit the driver's leg force to the hydraulic brake circuits under normal operation . . . sensors are employed to directly measure the braking effort applied by the driver so that the hardware can generate the proper hydraulic pressure." (Walker Report at 8 (emphasis added).) Dr. Limpert's initial report also confirms that brake pedal force has some correlation to brake pressure: "[The ABS has the ability to] increase the pressure from its current level up to a higher level, limited by the driver's input . . . ." (Limpert Report at 9.) At the very least, then, if the driver were to brake harder, the maximum brake pressure available to the ABS would increase. Regardless, the fact remains that none of Mr. Gelber's experts conducted testing to determine whether a driver could eliminate extended stopping distances by applying additional brake pedal force. Toyota's experts did conduct such testing, and determined that a driver is able to eliminate extended stopping distances caused by ABS activation by pressing harder on the brakes.

Mr. Gelber's actual experience with his vehicle is further evidence that the ABS does not function in an unsafe manner. Mr. Gelber has continued to drive his vehicle on a daily basis, and has never attempted to sell it. Despite the allegation that the ABS is unsafe in "virtually any scenario," (FAC ¶ 7), Mr. Gelber has driven his vehicle more than 40,000 miles without being involved in an accident due to the alleged defect. Over the course of seven years, he can recall only one incident in which the alleged ABS defect *almost* resulted in an accident. Even in that incident, however, he maintained control of the vehicle and was able to avoid the collision and ultimately stop the vehicle.

There is also no evidence that the Gen II Prius' braking performance is any worse than its peer vehicles. Indeed, it does not appear that Mr. Gelber's experts performed any comparison testing.[10] (Limpert Dep. 245:5–6.) In contrast, Dr. Walker compared the Gen II Prius to three other vehicles, a 2009 Honda Civic, 2009 Mazda 3, and 2009 Chevrolet Cobalt, and found that the Gen II Prius' ABS performance over bumps and roadway disturbances is substantially similar to the ABS performance of those vehicles. (Walker Report at 1.) Similarly, there is no evidence that Gen II Prius vehicles are involved in more accidents than peer vehicles. Indeed, Gen II Prius vehicles have enjoyed among the lowest collision claims of their class according to the Highway Loss Data Institute. (Defs.' ACE, Exh. 10.) Also telling is the fact that the National Highway Traffic Safety Administration has not instituted any investigations of the Gen II Prius' ABS, as it did with respect to the braking system of the Gen III Prius. Other third parties who evaluate vehicle performance and collect customer feedback, such as Car and Driver magazine, Motor Trend magazine, Consumer Reports, and JD Power and Associates, have never mentioned a problem with the ABS and consistently recommend Gen II Prius vehicles. (Defs.' ACE, Exhs. 10, 29–33, 40–42; *see* Defs.' ACE, Exh. 48 ["Keller

---

[10] Mr. Gelber included in his reply brief a chart purportedly comparing the Gen II Prius' ABS to peer vehicles. (*See* Pl.'s Reply at 3.) Mr. Gelber, however, failed to provide any citations for the chart, and it is not clear where he obtained the data.

Report"]). The Gen II Prius also enjoys the highest model loyalty in the industry, meaning that Gen II Prius owners are likely to purchase another Prius vehicle in the future. (Keller Report ¶ 28.) These facts are simply not consistent with an ABS defect that is "capable of creating a potentially deadly situation in virtually any scenario." (FAC ¶ 7.)

### B. Individual Questions of Fact Predominate

Because Mr. Gelber cannot point to a specific design defect common to all Gen II Prius vehicles causing dangerously extended stopping distances, to determine whether each class member's vehicle contains a defective ABS would require an individualized and particularized inquiry into each class member's experience with his or her vehicle. The huge variance in the stopping distances observed by Dr. Limpert illustrates the need for such individualized inquiries. Despite the fact that all of the tests conducted by Dr. Limpert involved a step in the road surface, the ABS only activated 62.60% of the time. (Limpert Report at 17.) Even when the ABS did activate, the actual stopping distances varied considerably. For example, when the vehicle encountered a two-inch step up at 80 kph on a dry surface, one test run resulted in 7.82 feet of extended stopping distance while another run resulted in 27.28 feet. (Limpert Report at 24.) When the test runs were conducted on a wet surface, one test run resulted in 34.2 feet of extended stopping distance while another resulted in 80.54 feet. (Limpert Report at 24.) The great discrepancies in test results illustrates how highly dependent stopping distances are on a wide variety of road conditions and specific driver performance. All of these factors would need to be considered for each individual class member to determine whether his or her specific Prius vehicle suffers from a defective ABS.

The case of Judy Daniel, which Mr. Gelber relies on heavily as supposed evidence of the ABS defect, illustrates the numerous individual factual inquiries that would be

required.[11] Ms. Daniel died in an accident in which her Gen II Prius vehicle was struck by a train. Mr. Gelber maintains that the accident occurred because the ABS activated after Ms. Daniel drove over a rough surface near the railroad. The activation of the ABS, he asserts, resulted in an extended stopping distance and prevented Ms. Daniel from stopping her vehicle before the railroad tracks. However, contrary to Mr. Gelber's contentions, whether an ABS defect was the cause of the accident is not self-evident.[12] To make that determination, the trier of fact would need to conduct a detailed factual inquiry into: (1) whether the ABS activated because of a rough road surface; and (2) whether the ABS caused an unsafe extended stopping distance. As to the first question, ABS is designed to activate whenever there is a risk of wheel slip, which can occur for a variety of reasons, only one of which is a rough road surface. Therefore, to determine what caused the ABS to activate would require an inquiry into Ms. Daniel's exact driving path, the precise moment the ABS activated, and whether there were other road conditions, such as water or ice, that could have caused the ABS to activate. The trier of fact would next need to determine whether the ABS actually caused an unsafe extended stopping distance. Stopping distances are dependent on numerous factors, including: (1) elevation; (2) surface composition; (3) roadway disturbances; (4) temperature; (5) coefficient of friction; (6) surface contaminants; (7) the driver's awareness; (8) the delay in braking; (9) the initial deceleration level; (10) the level of braking modulation; (11) the chosen stopping point; and (12) the driver's reaction time. (Dorris Report at 10.) Only

---

[11] Ms. Daniel is not a putative class member in this case.

[12] Indeed, Mr. Gelber's own theory on the cause of the ABS activation has varied throughout his briefings. In his motion for class certification, he implied that the ABS activated when Ms. Daniel's vehicle encountered the railroad tracks. (*See* Pl.'s Mot. at 9 ("Further evidencing the fact that the ABS System defect complained of [in this case and the Daniel's case] is substantially similar is Plaintiff Creighton's sworn testimony that she routinely experienced unwarranted ABS activation . . . when driving over railroad tracks.").) However, in his reply brief, he asserted that the ABS activated when Ms. Daniel drove over a rough surface on the side of the road. (Pl.'s Reply at 29 ("Plaintiff . . . has never made any [allegation that the ABS activated when it encountered the railroad tracks]. To the contrary, Plaintiff alleges that: (i) anti-lock braking in Mrs. Daniel's Prius engaged when the front wheels of her Prius Vehicle encountered a rough road surface on the paved roadway immediately before the railroad crossing.").)

after a consideration of these factors could the trier of fact conclusively determine that a defective ABS was the cause of Ms. Daniel's accident.

Because Mr. Gelber cannot point to specific design defect that is common to all Gen II Prius vehicles, a factual inquiry similar to that required for Ms. Daniel's case would be required for each and every class member. Only after a consideration of all the factors affecting ABS activation and stopping distances could the trier of fact conclude that a specific class member's vehicle suffers from a defective ABS. Clearly, this would require an extensive factual inquiry into the specific circumstances of each class member's driving experiences. These sorts of issues are best litigated on an individual basis, not through a class action.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Gelber's motion for class certification.

DATED: July 30, 2013

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE